UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DR. ARUNA JHA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 14 C 9041 |
| DAVID J. SHULKIN,[1] Secretary of the Department of Veteran Affairs, and | ) ) Judge Rebecca R. Pallmeyer ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION AND ORDER**

The United States Department of Veterans Affairs employed Plaintiff Aruna Jha as a social worker at the Hines VA Medical Center from 2012 to 2015. Jha alleges that her supervisors in the Spinal Cord Injury division of the VA discriminated against her on the bases of her age and national origin, subjected her to a hostile work environment, and retaliated against her for engaging in protected conduct, in violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634. Defendant has moved for summary judgment on each of Plaintiff's claims. For the reasons explained here, the motion is granted.

**BACKGROUND**

Plaintiff Aruna Jha immigrated to the United States from India in 1978, when she was 22 years old. (Dep. of Aruna Jha (hereafter "Jha Dep.") [52-2], at 8, 35, Ex. 1 to Def.'s Statement of Facts (hereafter "DSOF") [52].) She earned a Ph.D. in Clinical Social Work from the University of Illinois at Chicago in 2001, and began working for the Department of Veterans Affairs in 2009. (*Id.* at 7; DSOF ¶ 2.) Jha later applied for a managerial position in the Spinal Cord Injury (SCI) division of the Hines VA Medical Center in Hines, Illinois. (Jha Dep. 18-19;

---

[1] During the pendency of this case, David J. Shulkin replaced Robert A. McDonald as Secretary of the Department of Veterans Affairs. Shulkin has been substituted as the proper Defendant. *See* FED. R. CIV. P. 25(d).

DSOF ¶ 3.) SCI Director Michael Richardson interviewed Jha and hired her as a Clinical Social Work Manager in February 2012, subject to a "probationary period." (Def.'s Am. Answer to Third Am. Compl. [47], at ¶ 9; DSOF ¶ 3; Jha Dep. 16.)

Jha's duties initially included supervising a team of four social workers and managing a home health aid program. (Jha Dep. 14.) She did not provide direct social work services to patients in this supervisory role. (*Id.*) In January 2013, however, before her probationary period ended, Jha "was relieved of her supervisory responsibilities" and "assigned to a line staff capacity" in the SCI division. (DSOF ¶ 4; Jha Dep. 16.) It is not clear from the record who made this decision, or why it was made. Jha remained "at the same grade level" following the change, but she was "given charge of 98 long-term care, home care patients" and was "told that [she] was also the outpatient social worker from that point on." (Jha Dep. 19-20.) Allyson Vanscoy, one Jha's "prior direct reports," replaced Jha as supervisor of the social-work team. (*Id.* at 17-18.) Vanscoy was under forty years of age at the time and is "non-Asian." (Def.'s Am. Answer ¶ 17.)

Jha contacted the equal-employment opportunity office (EEO) at the Department of Veterans Affairs in September 2013. (Pl.'s Statement of Add'l Material Facts (hereafter "PSAMF") [60-1], at ¶ 44.) It is unclear from the record what prompted this contact, which occurred more than nine months after Jha says she was replaced as social work supervisor. Jha has testified that she spoke with a woman at the Department's EEO office named Lelar Taylor and "expressed to her my concerns about the growing hostility within spinal cord injury and the lack of clarity about my job description in the new position that I had been assigned." (Ex. 8 to Pl.'s Resp. Br. [58].) According to Jha, she also told Taylor that she "was not filing a written complaint at that time" and that she was "concerned about whether this information of my having visited the EEO's office would be carried back to Dr. Richardson." (*Id.*)

**I.  Jha's Suspensions from Work**

Jha's working relationship with Richardson and Vanscoy appears to have deteriorated over the next several months.  On November 22, 2013, Jha was suspended from work without pay for three days.  (PSAMF ¶ 52; Jha Dep. 72.)  The parties dispute the circumstances that led to this suspension.  Defendant contends that Richardson suspended Jha in November 2013 because of her failure to follow her supervisor's orders.  (Def.'s Resp. to PSAMF [63] ¶ 51.) Defendant cites a letter Richardson wrote to Jha in April 2014, which stated, among other things, that Jha's three-day suspension in November 2013 was premised on "two charges of negligent work performance; failure to follow SCI/D Home Care Program standards; failure to follow supervisory directions; and two charges of negligent work performance in [Jha's] documentation of a patient's medical record."  (Richardson Letter of April 4, 2014 (hereafter "April 4 Letter"), at ¶ 5, Ex. 5 to DSOF.)  Defendant provided no further details about these incidents.  Plaintiff contends that Richardson suspended Jha because of discriminatory or retaliatory animus.  (Pl.'s Resp. Br. 6.)  The only admissible evidence she cites to support this contention, however, is her own testimony that Richardson once admitted to Jha and others at a staff meeting that he had previously "built a case" against "a doctor who was also Indian."[2] (Jha Dep. 69-70.)  She also testified that she "believe[s] that age may have been a factor" in her interactions with Richardson, "in that . . . I was pretty close to Dr. Richardson in age and his preference may have been for younger people who would accept his leadership style and directives in a more compliant way."  (*Id.* at 35.)  But she has not provided any further detail about why she believes this.

---

[2]   Jha testified that she "believe[s]" this doctor's name is Siddiqui.  Neither party has provided any further details about Siddiqui or his interactions with Richardson.  Jha also cites her testimony that "one or two people of Indian descent" told her, at some point, that Richardson "didn't really like Indians," but she offers no other support for these hearsay statements.

3

Tensions between Jha and her supervisors persisted after she returned from her three-day suspension. Jha inadvertently allowed her professional license to expire on November 30, 2013, and then counseled 33 patients before she was able to renew it on December 12.[3] (DSOF ¶¶ 15-16.) At some point in December, Richardson and an unidentified "social work supervisor" learned (the record does not say how) that Jha's license was expired at the time she counseled these patients. Richardson and the supervisor contacted each of the 33 patients to notify them of the lapse in Jha's license and to explain that, although "the VA felt there was no associated harm . . . the facility determined that disclosure was the right thing to do." (DSOF ¶ 17.) Defendant has not suggested that disclosure was required by law. The following month, in January 2014, Jha recorded conflicting information in a patient's medical record and then failed to "redact and revise" the conflicting portions of that record when "her supervisor" directed her to do so.[4] (*Id.* at ¶¶ 13-14; April 4 Letter ¶ 1(l)-(m).) On February 18, Jha's supervisor directed her to "place a consult for a patient" and to "determine if . . . accommodations were needed" for the patient's annual evaluation. (April 4 Letter ¶ 1(k); DSOF ¶ 12.) Jha did not contact the patient or "place the consult" until March 3, the day before the patient's evaluation was scheduled to occur. (*Id.*; Pl.'s Resp. to DSOF ¶ 12.) The following week, on March 11, Jha failed to attend a mandatory staff meeting. (DSOF ¶ 10; Pl.'s Resp. to DSOF ¶ 10.)

On April 4, 2014, Richardson wrote a letter to Jha notifying her of a "proposal" to suspend her again, this time for 14 days. (DSOF ¶ 10; April 4 Letter.) As grounds for the

---

[3] Jha admitted in her deposition that her license expired on November 30, 2013, and was renewed on December 12, 2013 (*see* Jha Dep. 47-48), but she now purports to deny that she practiced social work without a license during this period because "the State never took any adverse action of any kind against [Jha's] social work license." (Pl.'s Resp. to DSOF ¶¶ 15-16.) It is unclear what kind of "adverse action" Jha is referring to here. Regardless, she cites no evidence to support her current position, and she offers no explanation for the apparent contradiction between that position and what she admitted in her deposition testimony.

[4] Jha now purports to deny that she failed to follow her supervisor's directions, but it is unclear whether her position is that she *did* follow those directions or whether she never received any such directions in the first place, and she cites no evidence to support either version. (*See* Pl.'s Resp. to DSOF [60-1], at ¶¶ 13-14).

proposed suspension, Richardson cited each of the incidents noted in the paragraph above. (April 4 Letter ¶ 1.) He also cited allegations that Jha had arrived for work several hours late, without permission from her supervisor, on February 26 and 28, 2014; had violated VA's privacy policy by conducting a computer search for patient records authored by Richardson, and then accessed confidential patient information in those files without a legitimate reason; and had violated the VA's privacy policy again on March 5 by printing "progress notes" containing patients' Social Security numbers and other private information, and then leaving those progress notes "unattended in the SCI printing area." (*Id.*) Richardson informed Jha of her right to reply orally or in writing to the proposed suspension, and to submit evidence "showing why the charges are unfounded and any other reasons why this proposed suspension should not be affected [sic]." (*Id.* at ¶ 2.)

Based on Jha's responses, Richardson "decided to drop" the charges relating to Jha's absences from work and her alleged breaches of VA privacy policies. (Richardson Letter of June 6 (hereafter "June 6 Letter"), 2014, Ex. 7 to DSOF.) He "sustained" the remaining charges, however, and informed Jha that she would be suspended from work from June 16, 2014 through June 29, 2014. (*Id.*)

## II. Jha's EEO Complaints

On May 21, 2014, before Richardson issued his final decision regarding Jha's 14-day suspension, Jha filed a formal complaint with the Department of Veterans Affairs Office of Employment Discrimination Complaint Adjudication (hereafter "EEO agency"). Jha subsequently amended the complaint twice. None of these administrative complaints are in the record, but the EEO agency's final decision on those complaints lists the claims Jha presented. (Final Agency Decision, April 21, 2015, Ex. 11 to DSOF.) Jha did not present a charge relating to the decision to "relieve" her of her supervisorial duties in January 2013. Rather, her charges, as amended, were limited to her suspensions from work, Richardson's disclosure to patients

5

that she had counseled them without a license, and the following additional events, the facts of which the parties do not seriously dispute.

### a. Respite admission

In February 2014, a home care nurse (not named in the record) asked Michael Richardson for permission to admit to the hospital a veteran whose roof was leaking due to snow damage. (DSOF ¶ 6.) Richardson denied the request because it would constitute a "respite admission"—that is, an admission not for the purpose of medical treatment, but rather to "provide the veteran with relief from the hazardous conditions at his home." (*Id.*) The veteran was nevertheless admitted to the hospital—the parties do not specify by whom—after speaking with a patient advocate. (*Id.*) At some point during this process—again, the parties do not specify when—Jha spoke with the home care nurse regarding "travel arrangements" for the veteran. (*Id.* at ¶ 7.)

The day after the veteran was admitted, Richardson convened a meeting with Jha and "the home care staff" to discuss the SCI division's policy regarding respite admissions. (*Id.* at ¶ 8.) During this meeting, Richardson asserted that the veteran's admission had been "instigated by the home care social worker (that is, by Jha) rather than by the home care nurse. (*Id.*)

### b. Unlocked File Drawers

At some point in 2014—Jha told the EEO agency this occurred on August 25, 2014, but stated in her deposition that this was a "typo" and the actual date was January 3, 2014 (Jha Dep. 49)—Alyson Vanscoy was looking for two file folders relating to outstanding payments to vendors, and asked Jha whether the folders were in Jha's file drawer. (DSOF ¶¶ 18-21.) Jha opened the drawer—which she was surprised to find was unlocked—and found the folders inside. (*Id.*) Jha subsequently sent an e-mail to Vanscoy claiming that someone must have broken into her office and put the folders in her drawer for the purpose of holding her responsible. (*Id.* at ¶ 21.) Defendant denies that Jha suffered any disciplinary consequences

as a result of the folders being there. (*Id.*) Plaintiff believes the folders were "planted" (Jha Dep. 53), but she has not cited any evidence to support this belief.

### c. Folders on Fee Clerk's Desk

In August 2014, Jha asked a "fee clerk" to "file" several folders. (DSOF ¶ 22.) The clerk told Jha to leave the folders on the clerk's desk, and Jha complied. (*Id.*) Vanscoy subsequently asked Jha "what were these folders doing on the fee clerk's desk? You were not supposed to leave them there." (*Id.*; Jha Dep. 54-55.) Plaintiff contends that leaving these types of folders[5] on the fee clerk's desk was common practice, and has cited testimony to this effect from the fee clerk. (Pl.'s Resp. Br. 10; Ex. 5 to Pl.'s Resp. Br.)

### d. Performance review

Also in August 2014, Jha asked to have her attorney present at her "midterm review" with Vanscoy. (DSOF ¶ 24.) An unidentified paralegal employed by Defendant advised Jha that her union representative, not a private attorney, should accompany Jha at the review. (*Id.*) An unidentified individual from Jha's union then informed Jha that the union would not represent her at the midterm review because she had already engaged a private attorney to represent her in her EEO proceedings. (*Id.*) On August 21, Jha wrote an email to Vanscoy stating that "I would prefer the mid-term review in writing. If you insist on meeting in person, I'll accept the document but will not participate in any discussion because of the lack of clarity on the representation issues." (*Id.* at ¶ 28; Jha E-Mail of August 21, 2014, Ex. 9 to DSOF.) Vanscoy subsequently sent Jha her midterm review via e-mail. (DSOF ¶ 29.) In this e-mail, Vanscoy stated that she was sending the review via e-mail "[b]ecause you refused to come for an in-person midterm review." (*Id.*) Neither party has presented any evidence regarding the content of this review.

---

[5] It is unclear from the record what was in these folders, or whether they were the same folders or the same type of folders that Jha found in her file drawer, either in August or in January.

7

### e. Performance Improvement Plan

Vanscoy subsequently drafted a "performance improvement plan" (PIP) that she intended "to assist with and help Jha improve her documentation." (DSOF ¶ 31.) Vanscoy met with Jha and "the union president" (who neither party identifies by name) to discuss the PIP. (*Id.* at ¶ 34.) Vanscoy made changes to the document based on the union president's recommendations, but none of the parties signed the document. (*Id.*)

On November 3, 2014, Vanscoy sent an e-mail about the PIP to Jha. This e-mail states, "You have not responded to matters involving the PIP since 08/29 when you indicated, 'that I will get back to you.' Your appraisal period is being extended through November 28th, 2014. Your PIP commenced on 08/28/14 and the first meeting was scheduled for 09/05/14. I have been performing chart reviews and I included the first 3 evaluations (attached)." (Vanscoy E-Mail of Nov. 3, 2014, Ex. 9 to DSOF.) Vanscoy's summary of the evaluations states that Jha "did not meet some of the PIP requirements week 1, but [was] successful weeks 2-3." (*Id.*) Jha responded that neither she nor her attorney had ever received "any notification from any party that the PIP was being activated." (Jha E-Mail of Nov. 4, 2014, Ex. 9 to DSOF.) On November 24, Vanscoy informed Jha via e-mail that "[a]ll aspects" of Jha's PIP "will be postponed until further notice." (Vanscoy E-Mail of Nov. 24, 2014, Ex. 9 to DSOF.) On December 9, Vanscoy requested that Jha submit a signed "performance appraisal" form that Vanscoy had given Jha to sign on August 28, 2014. (Jha E-Mail of Dec. 9, 2014, Ex. 9 to DSOF.) Jha responded that "we did not agree on the PIP" and "the PIP has been on hold since 11-17-14." (*Id.*) Vanscoy then told Jha that, because her "PIP was never formalized or implemented or in effect," Vanscoy was "proceeding with issuing your FY 14 performance appraisal and closing that out." (Vanscoy E-Mail of Dec. 10, 2014, Ex. 9 to DSOF.) Neither party has presented any evidence regarding the contents of this "performance appraisal."

### III. Procedural Posture

Jha filed this lawsuit on November 12, 2014, before the EEO agency issued a decision on her administrative complaint. (Compl. [3].) The agency subsequently denied Jha's administrative complaint on April 16, 2015, and the VA apparently terminated Jha's employment shortly thereafter. (*See* Third Am. Compl. ¶¶ 39-40.) Jha challenged her termination in proceedings before the Merit Systems Protection Board, and those proceedings were still pending as of May 1, 2017. (*See* MSPB Notice, Ex. 3 to Pl.'s Resp. Br.) Defendant subsequently moved to dismiss Jha's lawsuit to the extent that it asserted claims relating to her termination, arguing that Jha had not exhausted her administrative remedies. This court granted Defendant's motion and dismissed Plaintiff's claims relating to her termination, but allowed Plaintiff to proceed on the remaining claims in her Third Amended Complaint. (*See* Order of Jan. 25, 2016 [34].) These claims allege that Defendant retaliated and/or intentionally discriminated against Jha on the basis of her age and national origin, by disciplining her and harassing her while she was still a VA employee. Defendant has moved for summary judgment [49].

### DISCUSSION

To prevail on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In all employment discrimination cases, the "proper question to ask" at the summary judgment stage "is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Ferrill v. Oak-Creek-Franklin Joint School District*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The burden-shifting analysis derived from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973) is "a common, but not exclusive, method of establishing a triable issue of intentional discrimination." *Volling v. Kurtz Paramedic Services, Inc.*, 840 F.3d 378, 383 (7th Cir. 2016). It "identifies one pattern of evidence that would enable a reasonable juror to find discrimination—namely, a pattern showing that the plaintiff belonged to a protected class, met her employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class and who were treated better, provided that the defendant fails to articulate a reasonable alternative explanation or the plaintiff shows that the proffered alternative explanation is a pretext." *Bowen v. Bd. of Election Commissioners of City of Chicago*, No. 16 C 217, 2017 WL 3334854, at *3 (N.D. Ill. Aug. 4, 2017) (Feinerman, J.) But this mode of analysis "is not the only way to assess circumstantial evidence of discrimination." *Id.* Evidence that a proscribed factor caused an adverse employment action "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

I. **Employment Actions at Issue**

To determine whether a proscribed factor caused an adverse employment action, the court must first determine which, if any, of Defendant's actions in this case qualify as "adverse." The definition of an adverse employment action is broad, but "not everything that makes an employee unhappy is an adverse employment action." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). An employment action must be *materially* adverse to the plaintiff to trigger disparate-treatment liability under federal employment discrimination statutes. "[A] materially

adverse employment action is one which visits upon a plaintiff 'a significant change in employment status.' Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (citation omitted). The adversity standard for retaliation claims is somewhat less stringent than for disparate treatment claims, though "'petty slights or minor annoyances' won't do." *Nair v. Nicholson*, 464 F.3d 766, at 768 (7th Cir. 2006) (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2409, 2414 (2006)). "The test is whether the conduct alleged as retaliation would be likely to deter a reasonable employee from complaining about discrimination." *Id.* at 768-69.

In either case, an adverse action can be a single action or event, such as a discharge, or a series of lesser actions that, when considered together, create "a discriminatorily hostile or abusive environment." *Boss*, 816 F.3d at 917. The court considers in turn whether Defendant subjected Plaintiff to a discriminatorily hostile or abusive work environment, and, if not, whether any of Defendant's individual actions qualify as adverse.

**a. Hostile work environment**

To defeat summary judgment on a hostile work environment claim, a plaintiff must present evidence showing that "(1) the work environment was both objectively and subjectively hostile; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss*, 816 F.3d at 920. In this case, Jha's evidence falls far below the threshold for a hostile work environment. Many of the incidents she cites amount to little more than orders from her employer to perform basic administrative tasks in a timely fashion, such as revising a medical report to clarify conflicting information, maintaining an active professional license, making travel and lodging arrangements for patients, checking her files for overdue vendor payments, and safeguarding confidential information about patients. Richardson's

11

comment at a staff meeting about Jha "instigating" a "respite admission" perhaps exaggerated Jha's role in that process, but such a comment cannot possibly be described as "severe" harassment. So too for Vanscoy's comment to Jha that she "was not supposed to" leave file folders on the fee clerk's desk, and Vanscoy's characterization, in a private e-mail to Jha, of Jha's request to receive her midterm review in writing as a "refusal" by Jha to meet in person. None of this even begins to approach the type of workplace harassment that courts have found to be actionable discrimination. *Compare Hall v. City of Chicago*, 713 F.3d 325 (7th Cir. 2013) (reversing summary judgment for defendant who forbade plaintiff's co-workers from speaking with her, excluded plaintiff from all workplace meetings, became physically aggressive toward plaintiff and repeatedly tried to "bump" her when passing her in hallways, and expressed his desire to "slap" and "go postal on" plaintiff on multiple occasions), *and Pucino v. Verizon Wireless Communications, Inc.*, 618 F.3d 112 (2d Cir. 2010) (reversing summary judgment for defendant whose foremen repeatedly called plaintiff "stupid" and "bitch," harshly and publicly criticized plaintiff on multiple occasions for conduct they tolerated among male employees, and routinely denied plaintiff access to work tools in favor of male employees with less seniority), *with Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (affirming summary judgment for defendant whose employees referred to plaintiff as "black n---r" on one occasion and "boy" on another, brought plaintiff food but "slam[ed] the tray into his chest," refused to tell plaintiff where a janitorial closet was located, "ma[de] a mess for [plaintiff] to clean up," and "bait[ed]" plaintiff to "steal a purse and money from an open register"), *and Boss*, 816 F.3d at 920 (rejecting claim that employer engaged in retaliatory harassment where plaintiff presented only "a mishmash of complaints about overwork rather than about a place permeated with intimidation, ridicule, and insult."). The conduct Plaintiff Jha complains of was neither severe nor pervasive. Her hostile environment claim fails.

**b.    Individual actions**

Most of the discrete events Plaintiff has cited do not qualify as adverse. It is not clear that Plaintiff was actually ever subjected to a PIP, but even if she was, she has not presented any evidence that the tasks that the plan required of her were more than a minor annoyance. *See Davis v. Time Warner Cable of Southeast Wisconsin, L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("Performance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions.") She has not presented *any* evidence, meanwhile, that negative consequences of any kind flowed from her midterm performance review, Vascoy's reprimand regarding file folders left on the fee clerk's desk, Richardson's disclosure to patients that Jha counseled them without a license, or Richardson's comment that Jha "instigated" an improper "respite admission." "Unfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice [as evidence of material adversity]." *Boss*, 816 F.3d at 919.

Jha's termination, by contrast, as well as her suspensions from work, were clearly adverse employment actions. *See Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (citing cases finding disciplinary suspensions to be adverse employment actions). But the court has already dismissed any claims premised on Jha's termination, as she had not exhausted her administrative remedies on those claims. (*See* Order of Jan. 25, 2016.) That leaves only her suspensions and her January 2013 reassignment as potential bases for her claims at this stage.

The court need not decide whether Jha's reassignment qualifies as adverse, because Jha did not present any charge relating to it in her EEO complaints. "Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC," *Sitar v. Indiana Dep't of Transportation*, 344 F.3d 720, 726 (7th Cir. 2003)—or, in the case of federal employees, to the applicable agency's EEO office, *Reynolds v. Tangherlini*, 737 F.3d 1093, 1100 (7th Cir. 2013). Nor could Jha argues that her uncharged claims are "like

or reasonably related" to the charge(s) made to the EEO agency, *Sitar*, 344 F.3d at 726: each of the EEO charges involved allegations of discriminatory discipline and harassment, rather than reassignment, demotion, or failure to promote. *See Moore v. Vital Products, Inc.*, 641 F.3d 253, 257 (7th Cir. 2011) (discriminatory discharge claim was not like or related to claims of discriminatory harassment); *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010) (claim that employer discriminatorily dissuaded plaintiff from applying for a new position was not reasonably related to claims of discriminatory tuition reimbursement and retaliatory discipline). And the "like or reasonably related" doctrine is not available to revive a challenge to a discrete act that occurred months prior to the filing of administrative charges.

## II. Disparate Treatment

As Plaintiff's disciplinary suspensions are the only adverse employment actions for which she has exhausted her administrative remedies, the court next decides "whether the evidence would permit a reasonable factfinder to conclude" that Jha's age, race, or national origin "caused" those suspensions. *Ortiz*, 834 F.3d at 765.

Jha has not provided any evidence of explicit discriminatory animus, such as derogatory comments about her age or national origin. Although she has testified that she "believe[s] that age may have been a factor" in Richardson's various decisions, she has not explained why she believes this or presented any evidence that supports her belief. With regard to national origin, Jha has testified that Richardson stated during a staff meeting that, in Jha's words, he "built a case" against "a doctor who was also Indian." But Jha has not provided any details explaining what she means by "built a case," or suggested that Richardson "built" this "case" *because* the doctor was Indian.

Nor has Jha provided sufficient circumstantial evidence to establish a *prima facie* case of age or national origin discrimination. She has not established that she was meeting her employer's legitimate expectations at the time of her suspensions. Indeed, virtually all of the evidence in this case suggests that Jha was *not* meeting her employer's legitimate expectations.

14

This evidence suggests that, prior to both of her suspensions, Jha repeatedly ignored or failed to timely implement directives from her supervisors. Defendant cites these incidents as legitimate, non-discriminatory reasons for suspending Jha. And Plaintiff has offered no evidence—beyond her own conclusory allegations that discriminatory animus was the *real* reason she was suspended—that suggests Defendant's rationales are not credible. This is not enough to defeat Defendant's motion for summary judgment on her claims of disparate treatment based on age and national origin.

### III. Retaliation

Plaintiff's retaliation claims fail for similar reasons. The law requires Plaintiff to present evidence of "a causal link between [her] protected activity and the adverse employment action." *Boss*, 816 F.3d at 918. Plaintiff has not presented any evidence showing retaliatory animus. Although the timing of her first suspension (November 2013) is somewhat suspicious, as it occurred less than two months after she contacted the VA's EEO office, she did not file a formal complaint until the following May, and she has not pointed to any evidence that suggests her supervisors were aware of her preliminary EEO contacts until shortly before her formal complaint was filed. Jha claims that she told the EEO counselor that she was *concerned* about Richardson becoming aware of her inquiries. There is no evidence that Richardson actually knew of those inquiries before her November 2013 suspension.

Richardson presumably did know about Jha's protected activity at the time he made the final decision to suspend Jha a second time, as she filed her formal EEO complaint on May 21, 2014, and Richardson informed Jha of his decision on June 6. But Richardson's knowledge is not sufficient by itself for a reasonable jury to infer the requisite "causal link between [Jha's] protected activity" and her 14-day suspension, *Boss*, 816 F.3d at 918. As with claims of disparate treatment, a plaintiff relying on circumstantial evidence to establish a *prima facie* case of retaliation must show, *inter alia*, that she was meeting her employer's legitimate expectations at the time of the adverse employment action in question. The court has already concluded that

15

Jha was not, that Defendant has articulated legitimate, non-discriminatory (and non-retaliatory) rationales for suspending her, and that Plaintiff has presented no evidence that these rationales are pretexts. Defendant's motion for summary judgment is granted with regard to Plaintiff's retaliation claim.

## **CONCLUSION**

A reasonable jury could not conclude from the evidence in the record that Defendant suspended Plaintiff from work for a prohibited reason. Nor could a reasonable jury conclude from this evidence that Defendant subjected Plaintiff to a hostile work environment. Defendant's Motion for Summary Judgment [49] is granted.

ENTER:

Dated: March 27, 2018

REBECCA R. PALLMEYER
United States District Judge